HENRY BUSHNELL et al., Appellants, v. CHARLES A. LOOMIS et al.

**In Banc, May 9, 1911.**

1. **DURESS: Payments Thereafter.** Where a note is obtained by duress, the maker may either repudiate or affirm it; and voluntary partial payments for five years by him amount to an affirmance.

2. **INCAPACITY: Deed of Trust: Rescission.** In an equity case it is incumbent upon an appellate court to investigate the facts for itself and reach its own conclusions. And where the evidence shows that a married woman, physically frail at best, at the time she executed the deed of trust sought to be canceled, had reached that stage of life when the mind of woman is sometimes seriously disturbed, and could not have been in a mental condition to understand the legal effect of her act, the deed of trust, as to her, will be set aside.

3. **HOMESTEAD: Act of 1895: Vested Right of Husband: Rescission.** Under the Act of 1895 a husband cannot mortgage or convey the homestead, acquired prior to the enactment of that statute, unless his wife joins in the conveyance. [Overruling Gladney v. Snydor, 172 Mo. 318, holding that the husband, without the wife joining, has a vested right to convey a homestead acquired prior to the Act of 1895.] Therefore, if the wife was incapacitated by mental infirmity, to execute the deed of trust, and it must be set aside as to her, it will also be set aside as to her husband, whose note it was given to secure.

4. **———: Vested Right.** The homestead right of neither the husband nor wife is a vested estate prior to the death of the husband. The wife's right to homestead is inchoate during his life, and becomes consummate only upon his death, and

then first rises to the dignity of an interest or estate in land, but is even then only a life estate upon condition, namely, subject to be defeated upon remarriage. The husband's homestead right is practically only an exemption privilege accorded to him by the Legislature, subject to be inlarged or withdrawn; it is merely an exemption from execution; it is not a vested estate in him at any time.

5. ———: **Designation.** Under a Missouri statute a homestead is designated by use and occupancy. It does not require any formal selection, such as a petition to a court and an admeasurement by commissioners.

6. ———: **Alienation.** The State has the right to pass exemption laws limiting the right of alienation. It has the right to say that a husband's conveyance of his homestead previously acquired shall be invalid unless his wife joins therein.

7. ———: **Deed by Husband Alone: Rescission: Estoppel.** There is no power in the husband to make a valid conveyance of the homestead without the wife joining therein; and if it is void as to the wife, because of her mental incapacity to make it, it is also void as to him. And though he may have for five years made partial payments on the note, to secure which the deed of trust was given, and be denied the right for that reason to plead duress as a defense to the note; and though the wife, some years after her signature to the deed of trust was secured, regained her normal mental condition, yet neither is estopped to have the deed of trust set aside. Her signature was as if it were not on the instrument at all, and estoppel will not supply a want of power in the husband to convey, or make valid an act prohibited by express law.

Appeal from Livingston Circuit Court.—*Hon. J. W. Alexander,* Judge.

Reversed and remanded.

*Scott J. Miller* and *Frank S. Miller* for appellants.

(1) If the plaintiff Anna M. Bushnell was importuned by Timbrook to sign the deed of trust, and to induce her to sign he made the statement to her that these papers were to protect her husband against the prosecutions of the Bank of Dawn and to save him of this trouble, then her signature was obtained by du-

ress. Bell v. Campbell, 123 Mo. 1; Earl v. Norfolk, 36 N. J., Eq. 192. (2) The plaintiff being influenced by the threats, or covert acts of the defendant, is entitled to have the deed of trust cancelled for duress. Hensinger v. Dyer, 147 Mo. 219; Turley v. Edwards, 18 Mo. App. 676. (3) It is admitted in this case that Anna M. Bushnell did not owe the debt. Where a wife who was not the debtor is induced by threats or covert acts to mortgage her property, or to save a relative from criminal prosecution, equity will interfere and cancel the obligation. Morris v. Woodruff, 115 Mass. 233; Benedict v. Rome, 106 Mich. 378; Fry v. Piersol, 166 Mo. 434; Harris v. Carmody, 131 Mass. 51; Preid v. McKee, 42 Ia. 689. (4) Whatever destroys free agency and constrains a person to do what is against his will, what he would not do if left to himself, whether the control be exercised by physical force, meaning insinuations, threats or other species of mental coercion, is undue influence. Curley v. Edwards, 18 Mo. App. 679; Aedie v. Clemon, 26 N. Y. 9. (5) The evidence shows that Anna M. Bushnell was a woman of advanced age, a physical wreck, mentally unbalanced, cognizant of the fact that her husband was to be prosecuted, constantly under the doctor's care, was immediately after and before having hallucinations, tearing her hair, talking incoherently, and on the other side a shrewd business man, assignee of a banking company, the man in control of the business that her husband had handled, seeking to secure a debt to his father owed by the bank, accompanied by the cashier of the defunct institution, who was afterwards prosecuted in the same connection with her husband, acting as notary public, affixing her signature to a deed of trust on her homestead. These facts bring the case correctly within the rule laid down so exhaustively in the case of Bell v. Campbell, 123 Mo. 14.

*B. B. Gill & Son* and *Oscar L. Smith* for respondent.

(1)   Prior to the statute of 1895, the husband had a vested right in the homestead and could sell or encumber the same subject to the wife's inchoate right of dower, without the wife joining him in the deed, except when she had filed her claim as provided by Sec. 5435, R. S. 1889. Gladney v. Sydnor, 172 Mo. 318; Bouton v. Pippin, 192 Mo. 475; Leete v. State Bank, 115 Mo. 184.   (2)   The petition does not state that the debt was not honest, and pleading no fraud in the procurement of the new note and deed of trust other than threats, and the plaintiff, Bushnell, testifying there was no duress and no threats used when he executed the note and deed of trust, a court of equity under such circumstances could not relieve him from the payment of his honest obligation and the chancellor was fully justified in finding the issues for the defendant and dissolving the injunction. Fry v. Piersol, 166 Mo. 429.   (3)   The record shows that Henry Bushnell, plaintiff, acquiesced for many years in the giving of the new note and deed of trust and made voluntary payments on the note, and so far as he is concerned he is now estopped and will not be heard to complain and is not entitled to equitable relief. Hensinger v. Dyer, 147 Mo. 228; Murdock v. Lewis, 26 Mo. App. 234.   (4)   The petition charges that Mrs. Bushnell at the time she signed the deed of trust was of unsound mind and did not know what she signed; also that she signed the deed of trust to save her husband from criminal prosecution in connection with the failure of the Bank of Dawn. These allegations would seem to be inconsistent and contradictory. This is not a case where the wife mortgaged her own property to secure the debt of her husband to save him from criminal prosecution; she did not even sign the note given by her husband. The only issue as to the wife, coplaintiff

with her husband, Henry Bushnell, is: Is she entitled
to an order enjoining the sale of her husband's property
in which she has but a contingent, inchoate dower inter-
est, and a cancellation of the note and deed of trust
asked for in the petition? Under the law and the record
in the case she has no vested interest in the property
although it is her husband's homestead, and if we con-
cede that she signed the deed of trust under duress and
threats made as to her husband in connection with the
failure of the Bank of Dawn, or if she was not in her
right mind at the time she executed the instrument,
the legal effect of her act in either case is the same
and her dower would not be released, and if she should
survive her husband she could sue to have her dower
assigned in the property by making the proper show-
ing. The records shows that Mrs. Bushnell's last spell
of sickness was in 1901 or 1902; that since that time
her mind has been good. She was informed by her
husband three or four years before this trial of the
signing of the deed of trust and of the payments on the
note by her husband. The record shows that it has
been, up to the date of trial, eleven years since Mrs.
Bushnell had acknowledged the deed of trust. During
all this time the Bushnells have lived on the property
and enjoyed the rents and profits, and for four or five
years Mrs. Bushnell was fully aware of the fact that
she had signed and acknowledged the deed of trust and
that her husband had made payments on the debt. It
is now certainly too late for her to complain and call
upon a court of equity for relief. There is no reason
or excuse alleged in the petition why the suit was not
brought sooner and before the death of Henry Tim-
brook, the owner of the note. Barrett v. Davis, 104
Mo. 562; Dexter v. Macdonald, 196 Mo. 399. (5) Evi-
dence to establish fraud and duress in procuring a
deed or any other contract must be clear and convinc-
ing, leaving no reasonable doubt in the mind of the
chancellor, and this class of cases is analogous to that

class where a resulting trust is sought to be established by parol evidence. Jackson v. Wood, 88 Mo. 78; Smith v. Smith, 201 Mo. 547; Forrester v. Scoville, 51 Mo. 268.

GRAVES, J.—This cause has been certified to this court by the Kansas City Court of Appeals, on the ground that title to real estate is involved. The petition is one seeking to cancel and annul a deed of trust given upon the alleged homestead of the plaintiffs who are husband and wife. Defendant, Charles A. Loomis, is the trustee in such deed of trust, and defendants I. M. and George Timbrook are the executors of Henry Timbrook, deceased. In the petition it is charged that on August 26, 1895, and for some time prior thereto, plaintiff Henry Bushnell was the president of the "Bank of Dawn," a Missouri banking corporation; that in June, 1894, said bank borrowed of Henry Timbrook, now deceased, the sum of $2,000, and Henry Bushnell signed a note for said sum as surety thereon; that said money was put into and to the credit of said bank by order of the board of directors, and plaintiffs received no part thereof; that afterwards said bank became insolvent and its capital stock impaired; that therefore, I. M. Timbrook, acting for his father, was desirous of having said note secured and importuned plaintiff, Henry Bushnell, to give him a deed of trust upon his homestead; that said I. M. Timbrook, who had made the loan for his father in the first instance, and still acting as the agent of his father, when plaintiff Henry Bushnell refused to execute a deed of trust, then "by insinuations and assertions to this plaintiff, Henry Bushnell, insisted that as an officer of the bank he had violated the law by receiving and permitting to be received, by the cashier thereof, deposits after said bank had become insolvent, and that criminal proceedings would be instituted unless this note should be paid or secured and did inform this

plaintiff, Henry Bushnell, that if he would secure this note by giving a deed of trust upon his homestead he would protect him in all his matters as an officer of said bank; and that plaintiff, Henry Bushnell, believing said statement and relying on said promise, executed said note."

As to the plaintiff Henry Bushnell, the petition then further proceeds: "Said plaintiff insisted that he would not be liable for said note, but executed a new note in his own name for the payment of the Bank of Dawn debt to the said Henry Timbrook for the mere purpose of avoiding criminal prosecution by the defendant herein, and that the plaintiff Anna M. Bushnell is the wife of Henry Bushnell, and was on the 26th day of August, 1895, and occupied with him the land above described in this petition as said homestead."

As to the wife, Anna M. Bushnell, it is averred that at the time of the execution of the deed of trust she was sick and had been sick prior thereto and so continued for years thereafter. The deed of trust is of date August 26, 1895.

The representations made to this plaintiff and her mental condition at the time is thus stated in the petition:

"That at the time, to-wit, on the 26th day of August, 1895, the said I. M. Timbrook came to her home and told her that he had some papers that he wanted her to execute, and that unless she did execute them, her husband would get into grave trouble and would be prosecuted in connection with the failure of the Bank of Dawn; and that if she would sign the papers he had, this would avoid any trouble for her husband, and that the papers would not affect any of her property rights, and that if by signing these papers, at any time, she would be in danger of losing her homestead, he, himself, would take these papers and tear them up and release the obligation signed by her, and by

signing them she would save her husband from being prosecuted and doubtless much and serious trouble in connection with the failure of the Bank of Dawn, and assured her that he would hold these papers himself, and if at any time, after the trouble blew over, she would be in danger of losing her homestead he would tear these papers up and release whatever obligation she would be under by signing them; that upon this assurance from the said I. M. Timbrook, she signed the papers without reading the same, not knowing at the time, nor was she able to understand the import and the meaning of the same; and that she signed the same relying upon the promise of the said defendant, and for the purpose of securing her husband's safety.

"Plaintiff Anna M. Bushnell states that at the time, to-wit, on the 26th day of August, 1895, and for some months prior thereto, she had mental trouble and was not in such mental condition that she could know with any reasonable degree of certainty what business she was transacting. That her mind was in such condition affected by sickness that she was unable to transact any business whatever and that her mind was in such condition that she would not know the effect and did not know the effect of a deed of trust securing a promissory note, and at the time of signing of said deed of trust, from the effect of long illness, her mind was affected so that she could not comprehend what she was doing, except a great fear for her husband's safety. That while in such condition she executed a deed of trust, to secure a note of $2000, executed by Henry Bushnell, made on the 26th day of August, 1895, to Charles A. Loomis, trustee for Henry Timbrook, on all of the southeast quarter of the northwest quarter of section 18, township 56, range 24, Livingston county, Missouri; and that said deed of trust was made before C. D. Hurthal, notary public, and filed for record on the 27th day of August, 1895, in the recorder's office of Livingston county, Missouri, and

duly recorded in Book "91," Deed of Trust Record, page 311, a certified copy of which deed of trust is herewith marked 'Exhibit A.'

"Plaintiff, Anna M. Bushnell, states that this condition of her mind remained and existed until on or about the ———— day of September, 1902, and that during all that time the incident of having executed this deed of trust, further than the fact that she had executed some paper to save her husband from trouble, she did not know."

As stated the court was asked to annul and cancel such deed of trust and further to restrain a threatened sale by the trustee aforesaid.

In the answer of the defendants are some general admissions and then follow affirmative defenses.

Among the latter the defendants first plead that plaintiff Henry Bushnell owed Henry Timbrook a promissory note of $2000; that on August 26th he took up such note and executed in lieu hereof a new note for a like sum, being the note in controversy; that said new note was secured by a deed of trust as described in plaintiff's petition; that some five payments had been made by said Bushnell at divers dates from August, 1900, to September 1904, such payments aggregating in all $680; that such payments were voluntary and made without protest and without claim that the said note was not in fact and in law the note of the said Henry Bushnell, and that by reason of the long acquiescence therein, the said Bushnell is now estopped from denying his said obligation.

The answer then specifically denies that the note was procured in the manner and by the means stated in the petition. This is the answer as to Henry Bushnell.

Referring to the charges of the petition with reference to the plaintiff Anna M. Bushnell, there is a specific denial as to each charge made therein. The

answer then concludes with a general denial of all matters not specifically admitted.

Reply was a general denial. Judgment went for the defendants. The temporary injunction was dissolved and the bill of plaintiff's dismissed, with costs awarded against them. From such judgment plaintiffs have appealed.

I. Upon the facts this case is divided into two parts. In fact, the petition practically so divides it. The first allegations in the petition relate to plaintiff Henry Bushnell and the latter portion of the petition to his wife, Anna M. Bushnell. The petition charges that the money involved in the transaction was borrowed by the "Bank of Dawn," but the evidence shows that whilst in fact the "Bank of Dawn" was the principal upon the note, and plaintiff, Henry Bushnell, its president, was the surety, yet the money in the first instance was borrowed for the use and benefit of Henry Bushnell, and was in fact used by him for some time. According to Bushnell he afterwards paid the money into the bank, and from that time on he claims the debt should have been considered as the debt of the bank. This, under the evidence, was something like a year after the loan. Bushnell says that he got the money in the first instance, and that the note was so arranged and signed because the lender preferred to have the bank as principal, and him as surety, than to have Bushnell as principal and the bank as surety. In fact it might be concluded that the legal phase of the matter was considered, and evidently the lender concluded, that whilst the bank could borrow money, yet it could not go upon paper as a surety.

Plaintiff, as above stated, claims that he afterward paid the money to the bank and for that reason the note became in fact the debt of the bank. He does not deny that he borrowed it in the manner above described, and that the lender so understood it. Nor does he say that the lender was informed of the changed

condition or that the lender consented thereto. He admits that he gave the new note and the deed of trust, but expressly denies that they threatened to prosecute him if he did not so give them. There is nothing in his testimony which, as to him, would invalidate either his note or deed of trust.

In the course of the examination in chief of Henry Bushnell in his own behalf, this question and answer was found in the record: "Q. What conversation did you have outside of this conversation with Timbrook? A. He said if I would make a mortgage on my homestead he would take up the note,—give a new note and mortgage you know. That if I would make a deed of trust I could take this note up in the Bank of Dawn. I hesitated some time and they urged me very strongly. He said he would stay with me in all the trouble, that there might be considerable, *there wasn't any threats made to me.*"

In another place he says: "Q. You alleged in your petition that Mr. Timbrook threatened to prosecute you? A. No, I don't do such thing. Mr. Miller was off a little there. My wife was really bringing the suit. I would have changed it but we didn't have time. I ain't claiming any such thing."

Further on he again said: "Q. Now then you did execute this note and deed of trust voluntarily? A. Yes, sir."

These clear admissions concluded the claims of Henry Bushnell. Neither fraud nor duress occasioned his signing of these instruments. The more difficult question is as to the signature of the wife, which question we take later.

II. There is another reason why the plaintiff Henry Bushnell is not entitled to relief in this action so far as the note is concerned. He admits that for years after the giving of this note he made partial payments thereon. Where a contract is procured by du-

ress the party may either repudiate or affirm. The contract is not void but only voidable. If the party elects to repudiate, he must do so within a reasonable time after the duress has been removed. [Wood v. Telephone Co., 223 Mo. l. c. 564.]

In this case the admissions of Henry Bushnell not only show that he failed to repudiate the contract, but on the other hand in fact affirmed the contract by making payments thereon. He is not entitled to a rescission of the note now, even though we eliminate his affirmance thereof by reason of his voluntary payment thereon. In the Wood Case, supra, we said: "Rescission of a contract for fraud must occur on the discovery of the fraud. [Taylor v. Short, 107 Mo. 384.] By parity of reasoning a rescission for duress must occur when the duress is removed."

We therefore repeat that as to this plaintiff the action of the chancellor *nisi* is not subject to criticism, either as to the note or the deed of trust, except for reasons hereafter to be suggested. These reasons apply to the deed of trust alone and not to the note.

III. As to the plaintiff Anna M. Bushnell, we have examined the evidence with care. The evidence is not sufficient to show duress. It falls far short of such a showing. As to this plaintiff the contest below seems to have centered upon her mental condition at and about the time of the execution of the instruments. Upon this point the evidence for plaintiff is quite strong, and is only contradicted in a way, by the testimony of Timbrook and the notary. Two family physicians testify. The daughter testifies; the neighbor women testify. This testimony is practically all to the effect that at the time of the execution of this deed of trust she could not have been in such mental condition as would have enabled her to have understood the nature of the act then done. She had reached that stage of life when the mind of a woman is sometimes

seriously disturbed. She was physically frail at best, and from the testimony, both lay and professional, this period of transition in her life resulted in a nervous and mental derangement, more serious and pronounced than usual. So serious was it that at times she would pull and tear her own hair. The failure of the bank aggravated her own trouble. She was in a dazed condition, and was taken from her sick bed to sign the instrument. If the trial court based its judgment upon the fact that she was mentally capacitated to execute the deed of trust in question, then such judgment was clearly against the great mass of the evidence. In equity cases it is incumbent upon this court to investigate the facts for itself and satisfy its own conscience. What may bind the conscience of the chancellor *nisi* does not bind this court. Upon this point, under the evidence, we are constrained to hold that this plaintiff was mentally incapacitated to execute the deed of trust. What effect this holding should have upon the judgment, we discuss in following paragraphs in connection with the points made by respondent.

IV. Under the evidence the tract of land in dispute was acquired by Henry Bushnell in 1869, and he married his co-plaintiff in November, 1871. From the date of the marriage up to August 26, 1905, the date of the deed of trust, the land in question had been used as a homestead. It must be observed that by the Act of 1895—Laws of 1895, p. 185—the husband was debarred from alienating the homestead without the wife joining therein. Such conveyance, if attempted, is by such act declared void.

This statute, upon this point, reads: "The husband shall be debarred from and incapable of selling, mortgaging or alienating the homestead in any manner whatever, and every such sale, mortgage or alienation is hereby declared null and void."

But upon this point Division Two of this court has held that if the homestead was acquired by the husband prior to the Act of 1895, supra, then such husband has a vested right to convey the same without having the wife join, even though such conveyance be made after the Act of 1895 became effective. That in such instance the wife had left only her inchoate right of dower. [Gladney v. Sydnor, 172 Mo. 318.]

If this case be the law, and it is the law of this State, to this date, then Bushnell had the right to make this deed of trust without the wife joining therein. If he had such right to convey, then, although it be conceded that her signature was valueless, by reason of her mental condition, yet it would not wholly avoid the conveyance, under our finding expressed in paragraph one of this opinion. If he could convey without her, and did convey voluntarily, there could be no reason for enjoining his trustee from foreclosing the deed of trust. So that if the Gladney case, supra, be the law, it takes out of the case the question of homestead. But is this case good law, when we consider the homestead interest in all its bearings? The Gladney Case proceeds upon the theory that, because at the time the homestead was acquired the husband had the right to convey without the wife joining, such right became a *vested right,* and followed such homestead until the death of the husband, or until his prior conveyance thereof. In such ruling well grounded in reason, in view of what we have held to be the character of a homestead? We think not. The homestead interest has been variously defined by the courts. The difference in definition no doubt arises from the different wording of the statutes under construction. [See 21 Cyc., p. 460.] Bearing in mind that the basis of the Gladney Case, supra, is upon the theory of a *vested right,* let us investigate our own statutes and the decisions thereunder. First it is held that the rights of the wife are fixed by the statute in force at the time of

the husband's death. [Davidson v. Davis, 86 Mo. 440; Register v. Hensley, 70 Mo. l. c. 194; Linville v. Hartley, 130 Mo. l. c. 256; Burgess v. Bowles, 99 Mo. 543; Quinn v. Kinyon, 100 Mo. l. c. 554; Brewington v. Brewington, 211 Mo. 48.]

These cases, therefore, are opposed to the theory that she has has any *vested right*. They proceed upon the theory that, whilst she has an inchoate right, such right does not become consummate until the death of the husband. They proceed upon the same theory as do the cases as to inchoate right of dower. In 21 Cyc. p. 460, it has been well said: "The wife and children of the owner of a homestead have no estate or vested interest in the property during his lifetime. And laws forbidding a husband to sell or encumber the homestead without the wife joining do not give her an estate but a mere veto power over his right to convey or mortgage. Their occupation and enjoyment of it are merely incidental to their membership in the family. Their rights as owners become fixed at the death of the homesteader, and the nature and extent thereof are determined by the law in force when such rights devolve."

Our own cases recognize that after the death of the husband and the right of homestead has thereby become consummate, then the wife's right rises to the dignity of an interest or estate in land. [West v. McMullen, 112 Mo. l. c. 411; Hufschmidt v. Gross. 112 Mo. l. c. 656.]

But this is not true before homestead has become consummate by death of the husband. So, too, we have held as to the inchoate right of dower. [Brannock v. Magoon, 216 Mo. l. c. 727.] Dower is not an interest in lands until the death of the husband. By his death it becomes dower consummate and thereby an estate in lands. Homestead as well as dower are both life estates. The one created by common law, with statutory

234 Sup.—25

modifications; the other by statute, pure and simple. As to the former we have by statute even reduced it from a life estate to an estate upon condition, i. e., to be defeated upon remarriage. Under our law and our decisions, the foregoing fairly gives the status of the married woman. Such are her rights. As to homestead, they are fixed by the law in force at the date of the death of the husband.

From this basis let us proceed to discuss the rights of the husband. To do so we must consider the purpose of the homestead acts. Such acts are founded upon a public policy. This public policy was not to protect the single and unmarried man, but on the contrary, was to protect the married man, *his wife and children*. The purpose was not to confer a privilege or a right upon the man as a man, but upon the man as a head of a family, and a member of an immediate family. If, therefore, we say that the wife has no *vested right* prior to the death of the husband, why should we say that the husband has a vested right of any character?

We have held that the homestead right does not rise to the dignity of an estate or interest in land. [Snodgrass v. Copple, 203 Mo. 480.] Under this case the husband has practically only an exemption privilege accorded to him by the Legislature. If so, such privileges can be as fully withdrawn as they are given. We are now speaking of the pure homestead right, as separate and apart from the ownership of the land impressed with the homestead privilege. Under our rulings, as to the husband, this homestead right is merely an exemption from execution. This privilege is not of such character as to create a vested right. That which the lawmaking power, in pursuance of a certain public policy gave, it can by a change of public policy take away.

So that considering the homestead right alone we are not impressed with the idea of a vested right.

But the question in the Gladney case goes deeper and beyond this. In the case at bar Bushnell was the owner in fee of this land in 1869 and thereafter. Prior to the Act of 1895 he had the right to convey this land, subject to the inchoate right of dower, without the wife joining in the deed. He could make a deed and it would be valid. Under the Act of 1895 he alone could not make a valid deed. This therefore is the right of which he was shown by the Act of 1895. As to all lands not impressed with the homestead privilege he still has the right to convey without the wife joining. The question therefore is does this statute deprive him of a vested right? And the further question, if as a fact, it deprives him in a way of some of his rights, can the Act of 1895 be sustained in a case where the property was owned and held prior to the enactment of the law?

The Gladney Case, supra, is bottomed upon a number of North Carolina cases. In fact these cases are the only ones in which we have found the exact question discussed. It occurs to us that the Gladney Case overlooks the full purport of these several North Carolina cases, when we compare the provisions of their constitution and laws with the laws of this State. In 1868 the State of North Carolina adopted a constitution containing in article 10 thereof, among others, the following provisions:

"Sec. 2. Every homestead, and the dwellings and buildings used therewith, not exceeding in value one thousand dollars to be selected by the owner thereof, or in lieu thereof, at the option of the owner, any lot in a city, town or village, with the dwelling and buildings used thereon, owned and occupied by any resident of this State, and not exceeding the value of one thousand dollars, shall be exempt from sale under execution, or other final process, obtained on any debt. But no property shall be exempt from sale for taxes, or for

payment of obligations contracted for. the purchase of said premises. . . .

"Sec. 5. If the owner of a homestead die, leaving a widow, but no children, the same shall be exempt from the debts of her husband, and the rents and profits thereof shall inure to her benefit during her widowhood, unless she be the owner of a homestead in her own right. . . .

"Sec. 8. Nothing contained in the foregoing sections of this article shall operate to prevent the owner of a homestead from disposing of the same by deed; but no deed made by the owner of a homestead shall be valid without the voluntary signature and assent of his wife, signified on her private examination according to law."

Later the Legislature passed a law relating to homesteads and in such law we have this provision: "Whenever any resident of this State may desire to take the benefit of the homestead and personal property exemption as guaranteed by article ten of the Constitution of this State, such resident (or his agent or attorney) shall apply to any justice of the peace of the county in which he resides, and said justice of the peace shall appoint as assessors, three disinterested persons, qualified to act as jurors residing in said county, who shall, on notice by order of said justice, meet at the applicant's residence, and, after taking the oath prescribed in section two of this chapter for appraisers before some officer authorized to administer an oath, lay off and allot to the applicant a homestead with metes and bounds, according to the applicant's direction, not to exceed one thousand dollars in value, and make and sign a descriptive account of the same and return it to the office of the register of deeds."

See Battle's Revisal of the Public Statutes of North Carolina, 1873.

It will be noticed that the Constitution, as well as the law, left it to the property owner to select the

homestead. Such selection was to be made in a pre-
scribed method. Such selection was to be spread of
record in the recorder's office. Now while it is true
that the North Carolina cases hold that as to lands
acquired prior to the adoption of this Constitution the
wife did not have to join in the deed, yet the later case
of Castlebury v. Maynard, 95 N. C. l. c. 284, says:

"The plaintiff contends, that as the marriage took
place before the adoption of the Constitution of 1868,
and the land was owned by the plaintiff prior to that
time, the right of homestead did not attach to the land,
and the plaintiff could make a good indefeasible title
to the land, without joining his wife in the conveyance.
That, as a general proposition, has been too often de-
cided by this court to be controverted. But the de-
cisions referred to have held that to give the husband
such a right, the marriage and the ownership of the
land must both have existed before the adoption of the
Constitution. [Reeves v. Haynes, 88 N. C. 310; Bruce
v. Strickland, 81 N. C. 267.] And the same principle
has been applied to the right of dower by numerous
adjudications of this court. But in this case, while it
appears that the plaintiff was the owner of the land
where he had his homestead allotted, in April, 1869,
there is nothing in the record from which it is to be
inferred that he owned the land prior to 1868. But,
conceding that he did own it previous to that date,
still it does not follow that he can make a good title,
free from any incumbrance.

"When, on his own petition, he had his homestead
allotted to him in 1869, it was as such an acquiescence
in the appropriation of his land, as a homestead, it
must be deemed a voluntary surrender of his absolute
right of alienation, and it could not be impeached by
creditors, and the homestead would then pass to his
infant children or widow, as the law directed. [Bruce
v. Strickland, 81 N. C. 267.] The wife takes or ac-
quires no interest in the homestead until after the

death of the husband, and not then if he had children surviving him. But so soon as the homestead is allotted to the husband on his petition, it is a dedication by him of the land, to all the uses, privileges and restrictions of a homestead, no matter when the land was acquired, and the constitutional inhibition attaches to it, and the husband cannot convey it without the wife joining in the deed, and undergoing a privy examination as to its execution by her. Without such a formality, the deed of the husband is a nullity.''

. It should be borne in mind that the Constitution of 1868 was the first homestead act of North Carolina. This Castlebury Case discusses the previous cases . which were relied upon in the Gladney Case. From this Castlebury Case it may be seen that even in that State, if the husband selected his homestead, then he could not convey the same without his wife joining therein. This, too, notwithstanding he acquired title prior to the date of the Constitution. In other words, if he selected his homestead according to law, ''it is a dedication by him of the land, to all the uses, privileges and restrictions of a homestead, no matter when the land was acquired, and the constitutional inhibition attaches to it, and the husband cannot convey it without the wife joining in the deed, and undergoing a privy examination as to its execution by her.''

The Castlebury Case is cited in our Gladney Case, but not analyzed. The statute of this State provides for no formal selection by the husband. [R. S. 1899, sec. 3616; R. S. 1909, sec. 6704.] Such statute does say that such land, with the dwelling thereon shall be exempt, ''which is or shall be used by such housekeeper or head of a family as such homestead.''

In other words, under our law the husband designates his homestead by use and occupancy. In North Carolina it was designated by petition and a report of commissioners. One form of designation is as good as the other. If in North Carolina the dedication of

land to homestead purposes by the formal act of the husband prevented such husband from conveying the same without the signature of the wife, a dedication by use and occupancy in this State would have the same effect. If such formal dedication in North Carolina served as "a voluntary surrender of his absolute right of alienation," to our mind our method of dedication by use and occupancy would serve the same purpose.

In the Gladney Case this matter was not considered, and the ruling in that case is not in fact the ruling of the North Carolina court. At least, our case does not conform with the last expression of the North Carolina tribunal. These North Carolina cases form the basis of the opinion in the Gladney Case, and to our mind they do not support the conclusion reached in our opinion.

The land had been designated by use and occupancy as a homestead in the Gladney Case as fully as it had been designated by formal act in the Castlebury Case. We are of opinion that the Gladney opinion is erroneous on the facts involved.

V. We think that the Gladney Case is wrong for a further and better reason than the mere voluntary surrender of an absolute right as discussed by the North Carolina court. To our mind the State has the right to pass exemption laws limiting the right of alienation. If no other source of power could be found the police power of the State would justify a reasonable interference with a so-called absolute right. Governments cannot be maintained without some limitations upon absolute rights. The general welfare of the State and of its citizens demand at times the cutting off of a portion of the so-called absolute rights of the individual. Homestead exemptions are granted in the interest of the general welfare of our citizens. In such welfare the State has an interest. Public policy is opposed to pauperized widows and children. Pursuant to such public policy the State withdraws from credit-

ors certain portions of the debtor's property—this upon the theory that such laws better promote the welfare of all. Of course such laws do not benefit the creditor, but they do subserve a good purpose and tend to promote the general welfare of our citizenship as a whole. The whole tenor and spirit of free governments endorse such laws. In Gowdy v. Johnson, 104 Ky. 648, it has been well said: "The bad effect on the homesteader of rendering his habitation unstable, and increasing his anxiety for the continued shelter of his family, is not to be overlooked. While it is said that the State by such statutes is conferring merely a favor or privilege on the debtor, it is to be remembered that the State gets value received. It comes to be supported in time by a citizenship interested in the State and tied to her soil, of independent homeowners, and not of transient and uncertain tenants. It was aptly said by Mr. Benton in the Senate of the United States that 'tenantry is unfavorable to freedom. It lays the foundation for separate orders in society, annihilates the love of country, and weakens the spirit of independence. The tenant has in fact no country, no hearth, no domestic altar, no household god. The freeholder, on the contrary, is the natural supporter of a free government; and it should be the policy of republics to multiply their freeholders, as it is the policy of monarchies to multiply their tenants.' As already stated, we have heretofore decided, in effect, that once a homesteader, always a homesteader. And we think it is equally clear within certain limitations as to occupancy and possible exceptions to be noticed, once a homestead always a homestead."

To foster such beneficent purpose the State can within reasonable grounds curtail some of the rights of the individual. We know of no constitutional inhibition to the exercise of this power by the State, when exercised for the general welfare of its citizenship.

In Thompson on Homesteads and Exemptions, sec.

466, the law is thus stated: ''A statute which restrains the alienation of the homestead without the consent of the wife does not impair the obligation of contracts when applied to mortgages made after its passage to secure debts contracted before its passage. As to such debts the creditors have the same remedies against his estate which they had before the passage of the act. The Constitution of Nevada provides that the homestead 'shall be exempt from forced sale under any process of law, and shall not be alienated without the joint consent of husband and wife; . . . *provided,* the provisions of this section shall not apply to any process of law obtained by virtue of a lien given by the consent of both husband and wife,' etc. A statute which provided that no valid mortgage for the purpose of securing a lien or indebtedness could be made by husband and wife was held to be in derogation of this provision, and void. This conclusion seems unsound. The enacting of exemption laws is manifestly within the general power of every legislature, unless restrained by the written constitution; and the language of the Constitution of Nevada does not seem to imply a restraint on the Legislature against making the exemption more effective than the constitutional convention had seen fit to do.''

By statute we have continuously changed the laws of descent and distribution. By statute we have limited the right of disposition by will. [Spurlock v. Burnett, 183 Mo. 524; O'Brien v. Ash, 169 Mo. l. c. 297.] We have also continuously changed our laws as to the form of conveyance and the acknowledgment to be made thereon. We can, considering the question from all view points, see no valid reason why the State did not have the right to thus reasonably limit the power of alienation, as was done by the Act of 1895, and this too with reference to homesteads then existing, as well as to those afterward to be acquired. In this case we prefer to put our holding upon this broader ground.

We discussed the North Carolina cases largely for the purpose of showing that even under the rulings of that court the Gladney Case was wrong. Here we have a deed of trust executed by the husband and signed by the wife, but the wife under the proof mentally incapacitated to sign. In such case her signature is as if it were not there. [9 Am. and Eng. Ann. Cas., p. 14 and cases cited; 15 Am. and Eng. Ann. Cas., p. 1122 and cases cited.]

In such case she has not joined in the conveyance and the conveyance is wholly void.

Under these views the judgment *nisi* was wrong, notwithstanding the fact that there may have been no duress and no false representation or fraud, unless for other reasons it can be sustained.

VII. In paragraph three we suggested that Henry Bushnell was estopped to deny the note, because of subsequent payments thereon. We also suggested that for reasons to be assigned the rule applicable to the note might not be applicable to the deed of trust. We then had in view the question of estoppel urged as against both the husband and wife. From the evidence it appears that for some three or four years prior to this suit the wife had regained her mental capacity and it is urged that the suit should have been brought sooner and that she should be estopped from now prosecuting it.

As to this deed of trust there is no estoppel in the case. There was no power in the husband to make a valid deed without the joinder of the wife. In an elaborate note to the case of McDonald v. Sanford, 9 Am. and Eng. Ann. Cas., l. c. 14, the learned annotator thus summarizes the rule as well as the cases: "A conveyance of the homestead by the husband without the consent or joinder of his wife cannot operate by estoppel or otherwise against him, though it is executed by him voluntarily, and for a valuable consideration. It is simply void—a nullity, to all intents and purposes.

[Halso v. Seawright, 65 Ala. 431.] The conduct of the husband in attempting to mortgage or alienate the homestead without the joinder of his wife cannot operate as an estoppel against her, she being a stranger to such conduct. [Gober v. Smith (Tex. Civ. App. 1896), 36 S. W. Rep. 910.] 'Estoppel will not supply the want of power, or make valid an act prohibited by express provisions of law. The statute in effect declares a conveyance or incumbrance of the family homestead by the husband alone void, not only as to the wife, but also as to the husband himself. Therefore neither is estopped from asserting the homestead right as against the grantee or mortgagee. Such is the view sanctioned by the clear weight of authority and supported by the soundest reasoning. . . . To hold that such a conveyance could be enforced as against the husband while void as to the wife and children would not only be absurd in the extreme, but would be a flagrant usurpation of legislative powers.' [Whitlock v. Gosson, 35 Neb. 829.] Where a husband attempts to mortgage or alienate the homestead without the joinder of his wife, the instrument is void, and neither the husband nor the wife is estopped thereby to question the rights of the mortgagee or grantee therein. [Crim v. Nelms, 78 Ala. 604; Marks v. Wilson, 115 Ala. 561; Sears v. Dixon, 33 Cal. 326; Powell v. Patison, 100 Cal. 236; Green v. Marks, 25 Ill. 221; Richards v. Greene, 73 Ill. 54; Bruner v. Bateman, 66 Iowa 488; Alvis v. Alvis, 123 Iowa 546; Morris v. Ward, 5 Kan. 239; Ayres v. Probasco, 14 Kan. 190; Connor v. McMurray, 2 Allen (Mass.) 202; Doyle v. Coburn, 6 Allen (Mass.) 71; Beecher v. Baldy, 7 Mich. 488; Dye v. Mann, 10 Mich. 291; Barton v. Drake, 21 Minn. 299; Law v. Butler, 44 Minn. 482; Hoge v. Hollister, 2 Tenn. Ch. 606; Mash v. Russell, 1 Lea (Tenn.) 543; Williams v. Starr, 5 Wis. 534; Haite v. Houle, 19 Wis. 475.]''

If therefore the evidence is sufficient to show the mental incapacity of the wife, as we think it is, then the whole judgment *nisi* is wrong. We are of opinion that the result reached by the trial court was largely due to the ruling of this court in the Gladney Case, rather than the absence of evidence upon the question of mental condition. But be this as it may, the judgment is wrong and the same is reversed and remanded with directions to enter a judgment cancelling the deed of trust and enjoining the trustee from selling under the same. The note, however, should not be cancelled.

Judgment reversed and cause remanded with the direction above given.